

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2014 SEP 25   PM 12: 05

WILLIAM W. BLEVINS

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA



## SECOND SUPERSEDING INDICTMENT FOR CONSPIRACY TO COMMIT HEALTH CARE FRAUD, CONSPIRACY TO RECEIVE AND PAY HEALTH CARE KICKBACKS, MONEY LAUNDERING, CONSPIRACY TO FALSIFY RECORDS IN A FEDERAL INVESTIGATION, FALSIFICATION OF RECORDS IN A FEDERAL INVESTIGATION, HEALTH CARE FRAUD, AND FORFEITURE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL ACTION NO. 13-101 |
| VERSUS | * | SECTION: "R" (3) |
| MARK MORAD | * | 18 U.S.C. § 1349 |
| PAIGE OKPALOBI | | 18 U.S.C. § 371 |
| BARBARA SMITH, M.D. | * | 18 U.S.C. § 1956(a)(1)(A)(i) |
| JOE ANN MURTHIL | | 18 U.S.C. § 371 |
| LATAUSHA DANNEL | * | 18 U.S.C. § 1519 |
| ROY BERKOWITZ, M.D. | | 18 U.S.C. § 1347 |
| WINSTON MURRAY, M.D. | * | 18 U.S.C. § 2 |
| DIVINI LUCCIONI, M.D. | | 18 U.S.C. § 982 |
| CHRISTOPHER WHITE | * | |
| BEVERLY BREAUX | | |
| | *      *      * | |

The Grand Jury charges that:

## COUNT 1

## A.   AT ALL MATERIAL TIMES HEREIN:

### The Medicare Program

1.      The Medicare Program ("Medicare") was a federal health care program providing

benefits to persons who were over the age of 65 or disabled.  Medicare was administered by the

Fee_____
Process_____
X  Dktd_____
CtRmDep_____
Doc. No._____

United States Department of Health and Human Services ("HHS") through its agency, the

Centers for Medicare & Medicaid Services ("CMS").  Individuals who received benefits under

Medicare where referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United

States Code, Section 24(b).

3.      "Part A" of the Medicare program covered certain eligible home health care costs

for medical services provided by a home health agency ("HHA") to beneficiaries who required

home health care services because of an illness or disability that caused them to be homebound.

Payments for home health care medical services under Medicare Part A were typically made

directly to an HHA or provider based on claims submitted to the Medicare program for

qualifying services that had been provided to eligible beneficiaries, rather than directly to the

beneficiary.

4.      "Part B" of the Medicare program covered certain physician services, outpatient

and other services, including durable medical equipment ("DME") that was medically necessary

and was ordered by licensed medical doctors or other qualified health care providers.  DME is

equipment that is designed for repeated use and for a medical purpose, such as a power scooter,

accessories associated with power scooters (such as batteries and spare tires), and orthotics (such

as foot, ankle, knee, wrist, back and shoulder braces).

5.      Physicians, clinics and other health care providers, including HHAs and DME

companies, that provided services to Medicare beneficiaries were able to apply for and obtain a

"provider number."  A health care provider that was issued a Medicare provider number was able

to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.  A

Medicare claim was required to set forth, among other things, the beneficiary's name and

Medicare number, the services that had been performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider that ordered the services.

### Reimbursements for Home Health Services

6.     The Medicare Part A program, through a Medicare contractor, reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health care benefits.  A patient qualified for home health care benefits only if:

    a.     the patient was confined to the home, also referred to as homebound;

    b.     the patient was under the care of a physician who specifically determined that there was a need for home health care and established the Plan of Care ("POC"); and

    c.     the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy, the beneficiary was confined to the home, that a POC for furnishing services was established and periodically reviewed, and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7.     HHAs were reimbursed under the Home Health Prospective Payment System ("PPS").  Under PPS, Medicare paid Medicare-certified HHAs a pre-determined base payment for each 60 days that care was needed.  This 60-day period was called an "episode of care."  The base payment was adjusted based on the health condition and care needs of the beneficiary.  This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which

was a patient assessment tool for measuring and detailing the patient's condition. If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence. There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary remained eligible.

### Record Keeping Requirements

8.      Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the home health agency. These medical records were required to be sufficient to permit Medicare, through a contractor, to review the appropriateness of Medicare payments made to the home health agency under the Part A program.

9.      Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and physician signature. Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services, and an OASIS.

10.      Medicare Part A regulations required provider HHAs to maintain medical records of each visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or

4

symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury.

### Reimbursement for DME

11.     To receive payment from Medicare, a DME company, using its provider number, submitted a health insurance claim form, known as a CMS-1500. Medicare permitted DME companies to submit a CMS-1500 electronically or by way of a paper claim form. The CMS-1500 required DME companies to provide certain information, including (1) the Medicare beneficiary's name; (2) the Medicare beneficiary's identification number; (3) the name and identification number of the physician who ordered the item or service that was the subject of the claim; (4) the health care benefit, item, or service that was supplied or provided to the beneficiary; (5) the billing code for the benefit, item, or service; and (6) the date on which the benefit, item, or service was provided. When the claim was submitted, the provider certified that the contents of the form were true, correct, and complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program.

12.     Payments under Medicare Part B were often made directly to the DME company. For this to occur, the beneficiary would assign the right of payment to the DME company or other health care provider. Once such an assignment took place, the DME company assumed responsibility for submitting claims to, and receiving payments from, Medicare. Approved claims submitted to Medicare Part B were paid at 80 percent of the approved amount for each claim. Unless a Medicare beneficiary held supplemental or secondary insurance, Medicare

required that the beneficiary be responsible for paying the remaining 20 percent of the claim, known as a co-pay. Medicare rules did not permit a waiver of this co-pay.

## The Subject Medicare Providers

13.     Medical Specialists of New Orleans ("MSNO") was a medical clinic in New Orleans, Louisiana, that began operations on or about September 16, 2002. MSNO claimed to provide medical services to Medicare beneficiaries.

14.     Interlink Health Care Services ("Interlink") was a Louisiana corporation incorporated on or about January 30, 1997. Interlink claimed it was engaged in the business of providing home health services to Medicare beneficiaries. Interlink had a Medicare provider number and was eligible to receive payments from Medicare for home health services provided to beneficiaries, if the services were medically necessary. From on or about January 1, 2007, through on or about February 28, 2014, Interlink billed Medicare approximately $23,779,380 for home health services purportedly provided to Medicare beneficiaries, and was paid approximately $19,025,428.

15.     Memorial Home Health Inc. ("Memorial") was a Louisiana corporation incorporated on or about July 2, 2004. Memorial claimed it was engaged in the business of providing home health services to Medicare beneficiaries. Memorial had a Medicare provider number and was eligible to receive payments from Medicare for home health services provided to beneficiaries, if the services were medically necessary. From on or about January 1, 2007, through on or about February 28, 2014, Memorial billed Medicare approximately $13,927,234 for home health services purportedly provided to Medicare beneficiaries, and was paid approximately $16,083,431.

16.     Lakeland Health Care Services ("Lakeland") was a Louisiana corporation incorporated on or about June 23, 2004.  Lakeland claimed it was engaged in the business of providing home health services to Medicare beneficiaries.  Lakeland had a Medicare provider number and was eligible to receive payments from Medicare for home health services provided to beneficiaries, if the services were medically necessary.  From on or about January 1, 2007, to on or about February 28, 2014, Lakeland billed Medicare approximately $8,251,830 for home health services purportedly provided to Medicare beneficiaries, and was paid approximately $6,377,392.

17.     Lexmark Health Care, LLC ("Lexmark") was a Louisiana corporation incorporated on or about October 21, 2011.  Lexmark claimed it was engaged in the business of providing home health services to Medicare beneficiaries.  Lexmark had a Medicare provider number and was eligible to receive payments from Medicare for home health services provided to beneficiaries, if the services were medically necessary.  From on or about January 1, 2007, to on or about February 28, 2014, Lexmark billed Medicare approximately $7,285,373.96 for home health services purportedly provided to Medicare beneficiaries, and was paid approximately $8,379,510.

18.     Med Rite Pharmacy, Inc. (also d.b.a., Medrite DME, Inc.) ("Med Rite"), was a Louisiana corporation incorporated on or about January 10, 2001.  Med Rite claimed it was engaged in the business of providing DME to Medicare beneficiaries.  Med Rite had a Medicare provider number and was eligible to receive payments from Medicare for medically necessary DME provided to beneficiaries.  From on or about January 1, 2007, to on or about February 28, 2014, Med Rite billed Medicare approximately $3,562,231.02 for DME purportedly provided to Medicare beneficiaries, and was paid approximately $873,764.72.

## The Defendants

19.    **MARK MORAD**, a resident of Slidell, Louisiana, owned and operated Interlink, Memorial, Lakeland, Lexmark, and Med Rite, paid and caused to be paid illegal kickbacks to patient recruiters in return for referring Medicare beneficiaries for home health services, and caused fraudulent claims to be filed with Medicare by Interlink, Memorial, Lakeland, Lexmark and Med Rite for home health services and DME that were medically unnecessary and not provided.

20.    **PAIGE OKPALOBI**, a resident of Slidell, Louisiana, owned and operated MSNO, and caused physicians at MSNO to fraudulently certify that Medicare beneficiaries were homebound so that fraudulent claims could be filed with Medicare by Interlink, Memorial, Lakeland and Lexmark for home health services that were medically unnecessary and not provided.

21.    **BARBARA SMITH, M.D.**, a resident of Metairie, Louisiana, was a medical doctor licensed by the State of Louisiana who fraudulently certified beneficiaries as eligible for home health services so that fraudulent claims could be filed with Medicare for home health services that were medically unnecessary and not provided.  **BARBARA SMITH, M.D.** was the referring physician for approximately $14,394,163 in claims to Medicare.

22.    **JOE ANN MURTHIL**, a resident of New Orleans, Louisiana, was an office manager at Memorial who caused Memorial and other companies to submit fraudulent claims to Medicare for home health services that were medically unnecessary and not provided.

23.    **LATAUSHA DANNEL**, a resident of Laplace, Louisiana, was an office manager at Interlink who caused Interlink and other companies to submit fraudulent claims to Medicare for home health services that were medically unnecessary and not provided.

24.     **ROY BERKOWITZ, M.D.**, a resident of Slidell, Louisiana, was a medical doctor licensed by the State of Louisiana who wrote fraudulent prescriptions for DME provided by Med Rite that were medically unnecessary, and who fraudulently certified beneficiaries as eligible for home health services so that fraudulent claims could be filed with Medicare by Interlink, Memorial, Lakeland, and Lexmark for home health services that were medically unnecessary and not provided. **ROY BERKOWITZ, M.D.** was the referring physician for approximately $4,952,816 in claims to Medicare.

25.     **WINSTON MURRAY, M.D.**, a resident of Hammond, Louisiana, was a medical doctor licensed by the State of Louisiana who wrote fraudulent prescriptions for DME provided by Med Rite that were medically unnecessary, and who fraudulently certified beneficiaries as eligible for home health services so that fraudulent claims could be filed with Medicare by Interlink and Lakeland for home health services that were medically unnecessary and not provided. **WINSTON MURRAY, M.D.** was the referring physician for approximately $3,093,696 in claims to Medicare.

26.     **DIVINI LUCCIONI, M.D.**, a resident of Kenner, Louisiana, was a medical doctor licensed by the State of Louisiana who wrote fraudulent prescriptions for DME provided by Med Rite that were medically unnecessary, and who fraudulently certified beneficiaries as eligible for home health services so that fraudulent claims could be filed by Interlink, Memorial, Lakeland, and Lexmark with Medicare for home health services that were medically unnecessary and not provided. **DIVINI LUCCIONI, M.D.** was the referring physician for approximately $3,552,495 in claims to Medicare.

27.     **CHRISTOPHER WHITE**, a resident of Destrehan, Louisiana, provided accounting services at Interlink, Memorial, Lakeland and Lexmark, and helped **MARK**

**MORAD** and others to conceal the fraudulent claims that these companies submitted to Medicare for home health services that were medically unnecessary and not provided.

28.     **BEVERLY BREAUX**, a resident of New Orleans, Louisiana, was a registered nurse at Memorial who caused Memorial and other companies to submit fraudulent claims to Medicare for home health services that were medically unnecessary and not provided.

**B.     CONSPIRACY TO COMMIT CARE FRAUD (18 U.S.C. § 1349):**

29.     Beginning in or around April 2005, and continuing through in or around July 2014, in the Eastern District of Louisiana, and elsewhere, defendants **MARK MORAD**, **PAIGE OKPALOBI**, **BARBARA SMITH, M.D.**, **JOE ANN MURTHIL**, **LATAUSHA DANNEL**, **ROY BERKOWITZ, M.D.**, **WINSTON MURRAY, M.D.**, **DIVINI LUCCIONI, M.D.**, **CHRISTOPHER WHITE**, and **BEVERLY BREAUX** did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown to the Grand Jury, to commit health care fraud, that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of, and payment for, health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

**C.     PURPOSE OF THE CONSPIRACY:**

30.     It was a purpose of the conspiracy for defendants **MARK MORAD**, **PAIGE OKPALOBI**, **BARBARA SMITH, M.D.**, **JOE ANN MURTHIL**, **LATAUSHA DANNEL**, **ROY BERKOWITZ, M.D.**, **WINSTON MURRAY, M.D.**, **DIVINI LUCCIONI, M.D.**, **CHRISTOPHER WHITE**, and **BEVERLY BREAUX** to unlawfully enrich themselves by,

among other things, (a) arranging for the use of Medicare beneficiary numbers as the bases of claims filed for home healthcare services and DME that were medically unnecessary, and in some cases not provided; (b) causing the submission and concealment of false and fraudulent claims to Medicare, the receipt and transfer of the proceeds from the fraud, and the payment of illegal kickbacks; and (c) causing the diversion of the proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

**D.**    **MANNER AND MEANS OF THE CONSPIRACY:**

The manner and means by which the defendants and other co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

31.    **MARK MORAD** owned and operated Interlink and maintained a valid Medicare provider number for Interlink in order to submit Medicare claims for home health services that were medically unnecessary and, in some cases, were not rendered.

32.    **MARK MORAD** obtained and maintained signature authority for a corporate bank account of Interlink, Capital One Account Number xxxxxx2401.

33.    **MARK MORAD** owned and operated Memorial and maintained a valid Medicare provider number for Memorial in order to submit Medicare claims for home health services that were medically unnecessary and, in some cases, were not rendered.

34.    **MARK MORAD** obtained and maintained signature authority for a corporate bank account of Memorial, Capital One Account xxxxxx2282.

35.    **MARK MORAD** owned and operated Lakeland and maintained a valid Medicare provider number for Lakeland in order to submit Medicare claims for home health services that were medically unnecessary and, in some cases, were not rendered.

36.    **MARK MORAD** obtained and maintained signature authority for a corporate bank account of Lakeland, Capital One Account Number xxxxxx2320.

37.    **MARK MORAD** owned and operated Lakeland and maintained a valid Medicare provider number for Lakeland in order to submit Medicare claims for home health services that were medically unnecessary and, in some cases, were not rendered.

38.    **MARK MORAD** obtained and maintained signature authority for corporate bank accounts of Lexmark, Capital One Account Number xxxxxx8745 and Regions Bank Account Number xxxxxx0995.

39.    **MARK MORAD** owned and operated Lexmark and maintained a valid Medicare provider number for Lexmark in order to submit Medicare claims for home health services that were medically unnecessary and, in some cases, were not rendered.

40.    **MARK MORAD** obtained and maintained sole signature authority for a corporate bank account of Goldwell Investments, Inc., ("Goldwell"), Capital One Account Number xxxxxx1382 ("Goldwell Account").

41.    **MARK MORAD** and **PAIGE OKPALOBI** obtained and maintained signature authority for corporate bank accounts of MSNO, J.P. Morgan Chase Account Number xxxxxxxxxxx7381, and Capital One Account Number xxxxxx1465.

42.    **MARK MORAD** and **PAIGE OKPALOBI** owned and operated MSNO, and maintained a valid Medicare provider number for MSNO in order to submit Medicare claims for home health services that were medically unnecessary and, in some cases, were not rendered.

43.    Patient recruiters and other known and unknown co-conspirators including Demetrias Temple and Nicole Oliver, recruited Medicare beneficiaries, and caused Medicare beneficiaries to be recruited, so that they could be referred to Interlink, Memorial, Lakeland, and Lexmark for home health services that were medically unnecessary and, in some cases, were not provided, and so that Med Rite could supply these beneficiaries DME that was not medically

necessary.  In return, **MARK MORAD, PAIGE OKPALOBI** and **JOE ANN MURTHIL** paid and caused to be paid illegal kickbacks to patient recruiters for referring those beneficiaries.

44.     **BARBARA SMITH, M.D., ROY BERKOWITZ, M.D., WINSTON MURRAY, M.D., DIVINI LUCCIONI, M.D.** and other known and unknown co-conspirators (1) referred beneficiaries to Interlink, Memorial, Lakeland and Lexmark for home health services and signed POCs for beneficiaries so that these HHAs could bill Medicare for home health services that were medically unnecessary and, in some cases, were not rendered; and (2) prescribed DME to beneficiaries that was not medically necessary.  In return, **MARK MORAD** and **PAIGE OKPALOBI** fraudulently paid and caused payments to be paid to physicians, including **BARBARA SMITH, M.D., ROY BERKOWITZ, M.D., WINSTON MURRAY, M.D., DIVINI LUCCIONI, M.D.** and other co-conspirators,  in exchange for medical assessments and home and office visits purportedly conducted by the these physicians.

45.     **MARK MORAD, PAIGE OKPALOBI, BARBARA SMITH, M.D., JOE ANN MURTHIL, LATAUSHA DANNEL, ROY BERKOWITZ, M.D., WINSTON MURRAY, M.D., DIVINI LUCCIONI, M.D., CHRISTOPHER WHITE,** and **BEVERLY BREAUX** submitted and caused the submission of fraudulent claims to Medicare by billing for home health services and DME when such services and equipment were medically unnecessary and/or not provided.

46.     Reimbursements paid on behalf of Medicare to Interlink, Memorial, Lakeland, Lexmark, Med Rite and MSNO were deposited into bank accounts established by **MARK MORAD** and **PAIGE OKPALOBI** on behalf of the HHAs.  Once deposited, **MARK MORAD** transferred funds from these accounts into the Goldwell Account.

47.     Among other things, **MARK MORAD** used the funds in the Goldwell Account to pay patient recruiters.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Conspiracy to Pay and Receive Health Care Kickbacks (18 U.S.C. § 371)

**A.     AT ALL TIMES MATERIAL HEREIN:**

48.     Paragraphs 1 through 28 of this Second Superseding Indictment are re-alleged and incorporated as though fully set forth herein.

**B.     THE OFFENSE:**

49.     From in or around April 2005, and continuing through March 2013, in the Eastern District of Louisiana, and elsewhere, defendants **MARK MORAD, PAIGE OKPALOBI** and **JOE ANN MURTHIL** did knowingly and willfully combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is,

       a.     to knowingly and willfully solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare;  in violation Title 42, United States Code, Section 1320a-7b(b)(1); and

14

b. to knowingly and willfully offer and pay remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; in violation of Title 42, United States Code, Section 1320a-7b(b)(2).

## C. <u>PURPOSE OF THE CONSPIRACY</u>:

50. It was a purpose of the conspiracy for **MARK MORAD, PAIGE OKPALOBI, JOE ANN MURTHIL** and their co-conspirators, including Demetrias Temple and Nicole Oliver, to unlawfully enrich themselves by paying and receiving illegal kickbacks and bribes in exchange for providing Medicare beneficiary information that was used to submit claims to Medicare.

## D. <u>MANNER AND MEANS OF THE CONSPIRACY</u>:

51. The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

52. Paragraphs 31 through 47 of this Second Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

E.    **OVERT ACTS:**

53.    In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Eastern District of Louisiana and elsewhere, the following overt acts:

54.    On about May 6, 2005, **MARK MORAD** and **PAIGE OKPALOBI** paid and caused to be paid, $2,400 to Nicole Oliver, in exchange for Nicole Oliver referring Medicare beneficiaries for home health services.

55.    On about May 28, 2010, **MARK MORAD** and **PAIGE OKPALOBI** paid and caused to be paid, $600 to Nicole Oliver, in exchange for Nicole Oliver referring Medicare beneficiaries for home health services.

56.    On about May 6, 2011, **MARK MORAD, PAIGE OKPALOBI** and **JOE ANN MURTHIL** paid and caused to be paid, $10,800 to Demetrias Temple, in exchange for Demetrias Temple referring Medicare beneficiaries for home health services.

57.    On about April 20, 2012, **MARK MORAD, PAIGE OKPALOBI** and **JOE ANN MURTHIL** paid and caused to be paid, $8,400 to Demetrias Temple, in exchange for Demetrias Temple referring Medicare beneficiaries for home health services.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 3-5
### Money Laundering (18 U.S.C. §§ 1956(a)(1)(A)(i) and 2)

**A.     AT ALL TIMES MATERIAL HEREIN:**

58.     Paragraphs 1 through 28 of this Second Superseding Indictment are re-alleged and incorporated as though fully set forth herein.

**B.     THE OFFENSE:**

59.     On or about the dates identified below, within the Eastern District of Louisiana and elsewhere, defendant **MARK MORAD** did knowingly conduct financial transactions affecting interstate commerce as detailed below, which financial transactions involved the proceeds of specified unlawful activity, specifically health care fraud, contrary to Title 18, United States Code, Section 1347, and illegal health care kickbacks, contrary to Title 42, United States Code, Section 1320a-7b(b), knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of such specified unlawful activities.

| Count | Date | Transaction |
|---|---|---|
| 3 | 12/22/2011 | Check to L.H. from the Capital One Account Number xxxxxx1382 in the amount of $4,100.00 |
| 4 | 04/27/2012 | Check to J.W. from the Capital One Account Number xxxxxx1382 in the amount of $2,000.00 |
| 5 | 08/24/2012 | Check to Demetrias Temple from the Capital One Account Number xxxxxx1382 in the amount of $9,000.00 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

## COUNT 6
## Conspiracy to Falsify Records in a Federal Investigation (18 U.S.C. § 371)

**A.**   **AT ALL TIMES MATERIAL HEREIN:**

60.     Paragraphs 1 through 28 of this Second Superseding Indictment are re-alleged and incorporated as though fully set forth herein.

**B.**   **THE OFFENSE:**

61.     From in or around December 2012, and continuing through in or around February 2013, in the Eastern District of Louisiana, and elsewhere, defendants **MARK MORAD, PAIGE OKPALOBI** and **CHRISTOPHER WHITE** did knowingly and willfully combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is: to violate Title 18, United States Code, Section 1519, by knowingly altering, destroying, mutilating, concealing, covering up, falsifying, or making false entries in the records, documents, and tangible objects relating to the tax records, financial records, and/or personnel records of Goldwell Investments, Inc., with the intent to impede, obstruct and influence the investigation and proper administration of such matters and in relation to and contemplation of any such matter and case within the jurisdiction of a department and agency of the United States, specifically, a federal Grand Jury sitting in the Middle District of Louisiana, the Federal Bureau of Investigation, and Department of Health and Human Services, Office of the Inspector General.

**C.**   **PURPOSE OF THE CONSPIRACY:**

62.     It was a purpose of the conspiracy for **MARK MORAD, PAIGE OKPALOBI** and **CHRISTOPHER WHITE** to unlawfully impede, obstruct and influence the investigation and proper administration of such matters and in relation to and contemplation of any such matter and case within the jurisdiction of a department and agency of the United States,

specifically, a federal Grand Jury sitting in the Middle District of Louisiana, the Federal Bureau

of Investigation, and Department of Health and Human Services, Office of the Inspector General.

### D.     MANNER AND MEANS OF THE CONSPIRACY:

63.     The manner and means by which the defendants and other co-conspirators sought

to accomplish the object and purpose of the conspiracy included, among others, the following:

64.     Paragraphs 1 through 28, 31 through 47, and 53 through 57 of this Second

Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

65.     In or around December 2012, a federal Grand Jury sitting in the Middle District of

Louisiana issued subpoenas to companies operated by **MARK MORAD** and **PAIGE**

**OKPALOBI**, including Goldwell Investments, Inc., for personnel, payroll, and tax records.

66.     In or around February 2013, defendants **MARK MORAD, PAIGE OKPALOBI**

and **CHRISTOPHER WHITE** agreed to respond to the subpoenas issued by a federal Grand

Jury sitting in the Middle District of Louisiana by falsely fabricating Internal Revenue Service

forms and other employment records for Demetrias Temple, to give the false impression that

Demetrias Temple was a paid contractor with Goldwell Investments, Inc., all the while knowing

that Demetrias Temple had never been employed in any capacity by Goldwell Investments, Inc.

### E.     OVERT ACTS:

67.     In furtherance of the conspiracy, and to accomplish its object and purpose, the

conspirators committed and caused to be committed, in the Eastern District of Louisiana and

elsewhere, the following overt acts:

68.     In or around February 2013, **MARK MORAD** and **PAIGE OKPALOBI**

instructed **CHRISTOPHER WHITE** to fabricate Internal Revenue Service Forms 1099 for

Goldwell Investments, Inc. for purposes of providing such fabricated records to a federal grand

jury.

69.     In or around February 2013, **CHRISTOPHER WHITE** fraudulently created and caused to be created false Internal Revenue Service Forms 1099 and falsely back-dated employment applications for Demetrias Temple to give the false impression that Demetrias Temple had an employment relationship with Goldwell Investments, Inc. dating back to 2009, all the while knowing that Demetrias Temple had never been employed in any capacity by Goldwell Investments, Inc.

All in violation of Title 18, United States Code, Section 371.

## COUNT 7
## Falsification of Records in Federal Investigations (18 U.S.C. §§ 1519 and 2)

**A.     AT ALL TIMES MATERIAL HEREIN:**

70.     Paragraphs 1 through 28 of this Second Superseding Indictment are re-alleged and incorporated as though fully set forth herein.

**B.     THE OFFENSE:**

71.     In or around December 2012 through in or around February 2013, in the Eastern District of Louisiana, **MARK MORAD, PAIGE OKPALOBI** and **CHRISTOPHER WHITE** knowingly altered, destroyed, mutilated, concealed, covered up, falsified, or made false entries in the records, documents, and tangible objects relating to the tax records, financial records, and/or personnel records of Goldwell Investments, Inc., with the intent to impede, obstruct and influence the investigation and proper administration of such matters and in relation to and contemplation of any such matter and case within the jurisdiction of a department and agency of the United States, specifically, a federal Grand Jury sitting in the Middle District of Louisiana, the Federal Bureau of Investigation, and Department of Health and Human Services, Office of the Inspector General.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNTS 8-16
## Health Care Fraud (18 U.S.C. § 1347)

A.   **AT ALL TIMES MATERIAL HEREIN:**

72.   Paragraphs 1 through 28 and 31 through 47 of this Second Superseding

Indictment are re-alleged and incorporated as though fully set forth herein.

B.   **THE OFFENSES:**

73.   On or about the dates enumerated below, in the Eastern District of Louisiana, and

elsewhere, the defendants, **MARK MORAD, BARBARA SMITH, M.D., ROY**

**BERKOWITZ, M.D., WINSTON MURRAY, JR., M.D., DIVINI LUCCIONI, M.D., JOE**

**ANN MURTHIL,** and/or others known and unknown to the Grand Jury, did knowingly and

willfully cause to be submitted to Medicare the following false and fraudulent claims for

payment:

| Count | Bene-ficiary | ICN | Claim Dates of Service | Billing Code | Amount Billed | Defendant |
|-------|--------------|-----|------------------------|--------------|---------------|-----------|
| 8 | M.S. | 2112730 2159405 LAR | 07/22/11 - 09/19/11 (Lakeland) | 3CGK1 (Late Episode, 0-13 therapies, Clinical Severity Level 3) | $2,270 | **MARK MORAD; BARBARA SMITH, M.D.** |
| 9 | P.V. | 2113220 1066105 LAR | 09/13/11 - 11/11/11 (Lakeland) | 3AGK1 (Late Episode, 0-13 therapies, Clinical Severity Level 1) | $2,100 | **MARK MORAD; BARBARA SMITH, M.D.** |
| 10 | C.O. | 2120040 1464505 LAR | 10/26/11 - 12/24/11 (Interlink) | 1BFK1 (Early Episode, 0-13 therapies, Clinical Severity Level 2) | $840 | **MARK MORAD; ROY BERKOWITZ, M.D.** |
| 11 | C.O. | 2120940 2395005 LART | 12/25/11 - 01/11/12 (Interlink) | 3BGK1 (Late Episode, 0-13 therapies, Clinical Severity Level 2) | $250 | **MARK MORAD; ROY BERKOWITZ, M.D.** |
| 12 | W.W. | 2120130 0303305 LAR | 11/09/11 - 01/07/12 (Lakeland) | 3AGK1 (Late Episode, 0-13 therapies, Clinical Severity Level 1) | $2,030 | **MARK MORAD; WINSTON MURRAY, M.D.** |
| 13 | O.W. | 2111180 1495005 LAR | 02/25/11 - 04/25/11 (Lakeland) | 1CGK1 (Early Episode, 0-13 therapies, Clinical Severity Level 3) | $2,900 | **MARK MORAD; WINSTON MURRAY, M.D.** |
| 14 | E.C. | 2130100 2776107 LAR | 11/07/12 - 01/05/13 (Interlink) | 3AGK1 (Late Episode, 0-13 therapies, Clinical Severity Level 1) | $960 | **MARK MORAD; DIVINI LUCCIONI, M.D.** |

| Count | Bene-ficiary | ICN | Claim Dates of Service | Billing Code | Amount Billed | Defendant |
|-------|-------------|-----|------------------------|--------------|---------------|-----------|
| 15 | E.C. | 2130740 2661907 LAR | 01/06/13 - 03/04/13 (Interlink) | 3AFK1 (Late Episode, 0-13 therapies, Clinical Severity Level 1) | $1,560 | **MARK MORAD; DIVINI LUCCIONI, M.D.** |
| 16 | J.B. | 2123480 1215107 LAR | 11/29/12 - 01/27/13 (Memorial) | 1CFK1 (Early Episode, 0-13 therapies, Clinical Severity Level 3) | $1,200 | **MARK MORAD; JOE ANN MURTHIL** |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## NOTICE OF HEALTH CARE FRAUD FORFEITURE

74.     The allegations contained in Counts 1, 2, and 8 through 16, of this Second Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures to the United States pursuant to the provisions of Title 18, United States Code, Section 982(a)(7).

75.     As a result of the offenses alleged in Counts 1, 2, and 8 through 16, defendants **MARK MORAD, PAIGE OKPALOBI, BARBARA SMITH, M.D., JOE ANN MURTHIL, LATAUSHA DANNEL, ROY BERKOWITZ, M.D., WINSTON MURRAY, M.D., DIVINI LUCCIONI, M.D., CHRISTOPHER WHITE,** and **BEVERLY BREAUX** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense as a result of the violations of Title 18, United States Code, Sections 1347 and 1349, and/or Title 18 United States Code, Section 371 and Title 42, United States Code, Sections 1320a-7b(b)(1) and (2), which are Federal Health Care offenses within the meaning of Title 18, United States Code, Section 24.

76.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred, sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property;

All in violation of Title 18, United States Code, Section 982(a)(7).

## NOTICE OF MONEY LAUNDERING FORFEITURE

77.     The allegations of Counts 3 through 5 of this Second Superseding Indictment are re-alleged and incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 982.

78.     As a result of the offenses, alleged in Counts 3 through 5, defendant **MARK MORAD** shall forfeit to the United States all property real or personal, involved in the aforesaid offenses and all property traceable to such property which was involved in the said violations of Title 18, United States Code, Sections 1956 and 982.

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(1) to seek forfeiture of any other property of said defendant(s) up to the value of the above forfeitable property.

All in violation of Title 18, United States Code, Section 982.

A TRUE BILL

FOREPERSON'S SIGNATURE
HAS BEEN REDACTED

KENNETH A. POLITE, JR.
UNITED STATES ATTORNEY


WILLIAM G. KANELLIS
TRIAL ATTORNEY
CRIMINAL FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE


PATRICE HARRIS SULLIVAN
ASSISTANT UNITED STATES ATTORNEY
Louisiana Bar No. 14987

New Orleans, Louisiana
September 25, 2014

FORM OBD-34

No. 13-101 "R" (3)

# UNITED STATES DISTRICT COURT

Eastern ____ District of ____ Louisiana

____ Criminal ____ Division

## THE UNITED STATES OF AMERICA

vs.

**MARK MORAD, PAIGE OKPALOBI, BARBARA SMITH, JOE ANN MURTHIL, LATAUSHA DANNEL, ROY E. BERKOWITZ, WINSTON MURRAY, DIVINI LUCCIONI, CHRISTOPHER WHITE, and BEVERLY BREAUX**

# INDICTMENT

SUPERSEDING INDICTMENT FOR CONSPIRACY TO COMMIT HEALTH CARE FRAUD, CONSPIRACY TO RECEIVE AND PAY HEALTH CARE KICKBACKS, MONEY LAUNDERING, CONSPIRACY TO FALSIFY RECORDS IN A FEDERAL INVESTIGATION, FALSIFICATION OF RECORDS IN A FEDERAL INVESTIGATION, AND FORFEITURE

VIOLATIONS:   18 U.S.C. § 1349, 18 U.S.C. § 371, 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1519, 18 U.S.C. § 2, 18 U.S.C. § 982, 18 U.S.C. § 1347

A true bi _____

_____

FOREPERSON'S SIGNATURE
HAS BEEN REDACTED

Filed in open court this ____ ____ day of ____ ____

____ ____ A.D. 2014.

____ ____ ____ ____ Clerk

Bail, $ ____ ____ ____ ____

WILLIAM KANELLIS, Trial Attorney